Good morning, and may it please the Court, Jonathan Selbin, on behalf of plaintiffs and appellants, I would like to reserve a couple of minutes for rebuttal at the end. Your Honors, we think that it is now clear, to the extent it was not already clear at the time this case was before the District Court, that the arbitration ruling the District Court entered was incorrect. The law certainly developed very quickly during that time, which was the basis for our reconsideration motion below, and we think that it is now quite clear. But the real threshold question here, and where the rubber meets the road, is whether we even get to challenge that ruling in this Court or if we're sent back down in that Court. And we think that we're in a catch-22 that cannot have been intended by the law. So I want to start — It would be helpful to me if you began by — I think this is a really serious and important question, but I need to understand exactly what happened in the District Court with regard to it. Okay. So that would be helpful. Absolutely, Your Honor. We brought this case, and the defendants, Dell, filed a motion to compel arbitration. That issue was fully briefed before the District Court, including we put in evidence that showed that arbitration would be prohibitively costly on this type of claim. The District Court ruled against us. At the time, the law, both in California State court, which provided the substantive law, and from this court, was developing very fast, all of it with very few exceptions in our favor. As a result of that, we filed a motion to reconsider in front of the District Court. And I should take a step back and say the District Court did not hold a hearing on the motion to compel arbitration, nor did it hold a hearing on the reconsideration motion. I understand it wasn't required to do so, but it explains some of the delay was, for example, we filed the motion to reconsider, and the Court did not rule on it promptly. I intend no disrespect. But your motion to reconsider was at least several months later, right? Right. It was a number of months, during which we informed the Court on a – it was almost a weekly basis as new cases came down from the California Supreme Court, the California Courts of Appeals, this Court. I mean, even before you filed the motion to reconsider, there was a delay, though. There was some period. Yes. There was a period of delay before – that's right, Your Honor – a period of several months before we filed the motion to reconsider. Frankly, as we struggled to determine what our options were. I would take a step back and say the case was very much in its infancy. Nothing had happened. Nothing was happening. We weren't failing to meet obligations. The Court had asked for regular reports. I believe it was every six months, if my memory serves. So you didn't miss a report. We didn't miss a report. All right. We didn't fail to comply with any court order. We didn't fail to comply with any rule of civil procedure. We didn't fail to comply with any local rule. And our motion for reconsideration was not on time – was not on time. Then the motion to reconsider pens for a while. Do you ever go to the district court and say, either before or after the motion to reconsider, and say, just – we're not going to arbitrate. Dismiss the case. I believe we don't make that explicit until after the motion to reconsider is denied, although certainly in our opposition to the original motion to compel arbitration, we told the Court that it would be prohibitively expensive and that we thought the NAF was an unfair forum, which, as it turns out, we were largely proven right subsequently when the NAF agreed to stop doing these precisely because of allegations that it was unfair. All right. So then the motion to reconsider is denied, and then do you say, all right, we are not going to arbitrate. Dismiss the case. Yes, very clearly we say that in our joint status conference statement, which is in the record. And I just want to find exactly where we did that. Well, what kind of dismissal? The problem here is – one problem here, as I understand it, is that this is a dismissal for failure to prosecute. That's the key. Which is a kind of dismissal, but under our law, you can't reach the underlying issue. That's exactly the problem, Your Honor. So in our – in our joint status conference statement, which is in the record before this Court at 65 to 71, we expressly said that we could not arbitrate and I can quote the actual language, if Your Honors would like. We said because of the gross unfairness of the NAF, the Court's order holding that Dell's class action waiver was unenforced – was enforceable, the plaintiff's stipulation that they will not pursue their case if they cannot proceed on a class-wide basis, plaintiffs ask that the Court enter a final order so they may appeal the Court's order's compelling arbitration and holding the class action waiver to be enforceable. Plaintiffs are not refusing to prosecute their claims. They are only refusing to arbitrate them in a manner which is – which, as described above, would be futile. So we were very clear.  Kagan. You understand that to be – to be technical about it. A request for dismissal under Rule 41A2, except as provided – an action may be dismissed if the plaintiff's request by court – following the court order on terms that the court considers proper. Is that what you're – we're asking for? You know, Your Honor, I think that's right. I can – I can tell you that we struggled procedurally mightily with what the right form of dismissal would be. The Al-Torky case says that we – that had Al-Torky in that case requested that judgment be entered against him, maybe he could have appealed. We were trying to accomplish that with this, but it's – it wasn't clear to us, to be perfectly honest, what the actual procedural mechanism should have been, which is reflected in our subsequent letter to the court when the court asked what it should do. The court then asked, should I dismiss for failure to prosecute? And our response in the letter to the court, which is what the court asked for, is, no, you shouldn't dismiss for failure to prosecute. You have these other options. Kagan. Well, okay. Let me – I suppose if you follow, there's a First Circuit – there's some cases on this. There's a First Circuit case that says if you – if you take a voluntary dismissal, you can reach the underlying, but that didn't happen here. May I just ask you a question? In order to reach the underlying issues, which are – which I understand for your client are significant, could we construe this as a petition for mandamus rather than a appeal? Your Honor, I don't – I don't feel able to comment on that. I'm not as steeped in the mandamus law. I guess if that's one way to get there – I mean, we've struggled with all of this. I mean, the review is – the standards for mandamus are very strict. Right. Right. And we haven't attempted to make out – And you haven't tried to make that case out. That's right. I mean, what I would say, Your Honor, is that I think that the – the Huey line of cases is a limited exception to the merger rule. And we think that it has to be a fact-specific limited exception. And we don't think the facts here come anything close to the facts in Huey and Ash and these other cases where there was delay and people failed to show up for trial and there was violation of the rules of civil procedure. No, but that's going to make a lot of work. I mean, the whole point of Huey is if you don't prosecute your case, you're not going to be able to get to the underlying issues. Right. That's right. And that's a fair limit. And that ought to be a fairly blanket rule. I think that's probably right, Your Honor, but there has to be a limit to it. And here – But also, in this instance, you – I mean, what really happened is the Court – you said, I want to prosecute my case to the district court. Let's prosecute the case. Right. And the district court says, no, go over there. Right. I'm not – I'm not going to prosecute the case. That's right. I'm not going to allow you to prosecute it here. And I think that's important, because if you look at the Weill case, which they cited and I don't think we addressed sufficiently in our papers, the Weill case says, even if we win on the failure to prosecute issue, we have to go back down to litigate the under – the underlying issue again, and even if that means we have to do it individually, so be it. In the Weill case, the plaintiff got sent back to litigate in district court, a fair forum. In our case, if we are sent back down, if this Court just reaches the issue of the dismissal for failure to prosecute and says, we're not reaching any other issues because of the exception to the merger rule, we get sent back down and we get sent back to arbitration. We don't get the fair forum that at least the plaintiff in Weill got. We get sent back to arbitration. And so we're in a real catch-22 here. There's no obvious solution other than for this Court to reach the merits. If this Court doesn't reach the merits, I guess we could try to get Judge Hamilton below to reach the merits again, but I'm not even sure what that would look like. She's denied – she granted their motion. She denied a motion to reconsider. Well, yes. The problem is that if she orders arbitration, you can't appeal from that. We're stuck again. That's right. Whereas if she denied arbitration, you – there would be an appealable order. That's right. That's right. That's the nub of the issue. And so we think that there ought to be some limit to the limited exception, that it ought to be one that these facts fit perfectly, which is that we complied with every rule. We were up front from the beginning about the problem that we had and what we were trying to resolve. We presented the Court a host of options. We presented the option of staying pending the Osterreicher v. Alienware appeal. Well, suppose we were to say – let me try another one. Sure. Suppose we were to say that this is not – just review this failure to prosecute and say this is not a failure to prosecute, because what you want is to prosecute the case. That's right. You haven't missed any deadlines or anything like that, so there isn't – if we were to conclude that, that's a separate issue. Right. As to whether or not there was delay, and this is a legitimate dismissal for failure to prosecute. But leaving that aside, if we were to say, what, the district court, this is not a failure to prosecute. This is really a – you moved for it. You wanted to make this reviewable, so this is really a voluntary dismissal. Right. In treating it as a voluntary dismissal, which is what the Court really meant to do, we can reach the underlying issues. I think you can reach the underlying issues if you construe it that way. And certainly that's what Al-Torky says. I'm not saying we can do that, but I – Right. Well, Al-Torky does say, if Mr. Al-Torky had bet everything on this appeal by asking for the dismissal, maybe it would have been a different outcome. Well, I would suggest that that's what we did. And, in fact, you recognize that this is not the same as appealing. If you were allowed to go forward, it would not be the same as appealing an interlocutory appeal, because if you lose, you've lost. That's right. You're out. We stipulate to that. That's the risk that we are prepared to take as we understand Al-Torky requires us. We are confident that under existing – and I'm prepared to address this, but I think there's not a lot of dispute about it anymore – that this clause is not enforceable under California law at this point. California law is clear on that. Ninth Circuit law is pretty clear on that. So we think that we win that part of the appeal, and then we get to go back down. Well, there's a prior choice of law question, which maybe you should address. I'm happy to address the choice of law question. I think the starting point on the choice of law question is this burden issue. And it's a very technical issue, but I think it's very important. In the State Court AOL case that we cited to the Court, the California Court of Appeals said that the usual choice of law rules do not apply in a CLRA case. This is a CLRA case. Now, I understand that a number of courts, including Judge Patel in the Osterreicher case, said, oh, no, no, that's just about choice of forum. I would suggest that if the Court reads the opinion, it's quite clear that it's about both choice of law and choice of forum. And Judge Nelson's opinion in the Federal AOL case, the Doe v. AOL case, and the cite on that is 552 F. 3rd. 1077. It's sort of an odd opinion. There's a – there's a procurium opinion, and then Judge Nelson writes a two-judge concurrence. And she adopts our reading of the burden issue in that opinion and makes the point that in a CLRA case, the burden is different. Now, there's two points that I want to make about that in addition. Number one, that's not a preempted argument under the FAA because it's not specific to arbitration. It's specific to CLRA cases. Both of the AOL cases were not arbitration issues. So it's a rule of general application that California applies any time the CLRA is at issue. So that's the first point. The second point is Judge Patel had ruled in the Oesterreicher case that Washington Mutual, and I believe Judge Hamilton here adopted the same reasoning, that the California Supreme Court's Washington Mutual case trumps the AOL case. I would just make the point that we don't dispute that Washington Mutual is good law. It's just not a CLRA case. AOL is a CLRA case, creates a separate rule for CLRA cases. Washington Mutual didn't involve a CLRA claim. So on the choice of law issue, you then get to this issue of fundamental policy and materially greater interest. On the fundamental policy, I would respectfully point the Court to the Alienware decision on appeal. I recognize it's unpublished, but it has the analysis. It has.  That's the Oesterreicher. And there was a lot of talk about that. This seems to be a comedy of errors. There was a lot of discussion about the Oesterreicher case and possibly waiting to see what happened on appeal. That's right. And then we decided it affirmed Judge Patel, but didn't make it precedential. When was that, by the way, that opinion? When was that? That was within the last year. I don't recall the exact date. Because our rules say that you're supposed to publish opinions when there's an underlying published opinion. There was an underlying published opinion. There was an underlying published opinion. And I believe the defendants, or at least someone on their behalf, sought publication. And the Court denied that. And frankly, we think that that was a very important decision because it addressed all sorts of important issues that are going to come up again. And you agree with it. We can cite it. We can talk about it. That's right. We can be bound by it. That's right. And I think the analysis there on both the fundamental policy that California has and its material real – I can't say that word – the greater material interest that it has in the case outweighs any interest Texas has in the enforcement of just a contract of one of its resident corporations. Now, I'll note – and I see that my time is out. That's fine. I'll note that there was a petition for rehearing in the Osterreicher case that was denied. We sought it because we disagreed with the second half of the opinion. And that didn't happen. So that's the nub of the argument I want to make. I guess there is one other point that I think needs to be addressed. I can do it now or on rebuttal. Let's do it. Let's get it all out. Okay. All right. The one other point is this issue of what happens if the case got sent back given that the NAF no longer performs these kinds of arbitrations. And I think they are probably correct. And I want to concede the point that under Federal law – that Federal law would govern that and that – and that the Court could appoint an alternate arbitrator except if the naming of the arbitrator was integral to the clause. The case they cite, the arbitrator wasn't even named here. Very specifically, if you look in the record at pages 90 to 92, they specifically gave exclusive and final arbitration authority to the NAF. So I don't believe even if it got sent back … But – but your theory is that we wouldn't reach that. That's right. That's right. Okay. Okay. Thank you. We'll give you a minute, Your Honor. Okay. Thank you, Your Honor. May it please the Court, good morning. Paul Schlout on behalf of Defendant DiPelli, Dehling. Fundamentally, this case is about the authority of a district court to enforce its orders in the face of a refusal by a party to comply, and it also raises the issue of whether plaintiffs are permitted to manufacture finality in order to avoid interlocutory orders they don't like. Well, the answer to that is sometimes yes, isn't it, in various instances? I mean, for example, there's a Supreme Court Procter & Gamble case. There's the First Circuit's suggestion that you can take a voluntary dismissal under those circumstances, or Edward's case about failing to amend. The answer is that there are times when you're entitled to take a principled position that we are not going to comply with this order and enter a dismissal and we'll go up. I agree, Your Honor, that different circuits have adopted different approaches. I have not found anything in the Ninth Circuit that provides the avenue that plaintiffs serve. But this case wasn't dismissed for failing to comply with an order. It was dismissed for a lack of prosecution, which is not what happened. I — we disagree with that strongly, Your Honor. We think that they both fail to comply with an order and fail to comply with an order. Well, that really is a threshold issue as to whether or not there was delay and refusal to comply with orders that justified it. And perhaps it would be helpful for me to go through the facts as I see them very quickly. Judge Hamilton ordered individual arbitration in February 2007 and said, give me an update on the status of those proceedings in six months, not tell me how life is going in six months. Go arbitrate and tell me what's happening in six months. Five months passed without any action. At no point here has plaintiff come forward and said, this game is up. Let's go up and appeal because we're not going to comply with your order. They hide that fact. Move for reconsideration five months later. Well, that's not inconsistent. They obviously want that the order changed. If the word changed, that would be a different matter. There's a five-month delay there. But certainly moving for reconsideration is not inconsistent with the position that if we — if you don't change your mind, we're not going to comply with — we're not going to arbitrate. But they've not made that position known to the district court yet. I'm not saying they don't have a right to reconsideration. I do think it's wrong to waste the district court's time and resources by making her write a 44-page reconsideration order. Wait a minute. They weren't wasting it. They were trying to get her to change her mind. Then they would have gone forward. But they weren't going to go forward. I mean, but they didn't — They would have gone forward if she changed her mind. I'm sorry? That's right. Right. So it wasn't wasting anything. Well, we may see that issue differently. That seems to me like gamesmanship and brinksmanship. But there is a further delay. So on February 5th, 2008, she resolves reconsideration. Still no word from plaintiffs. Judge Hamilton's order at that point is, in two months, tell me what's going on in the arbitration. It is an order from a district court compelling this party to go and take an action which has initiated an arbitration. In Morgan Stanley, this Court has said, if district courts don't get to enter dismissals for want of prosecution for failure to comply with those orders, our ability to administer the FAA is going to be greatly undermined. So there's not — this Court has already passed the question of whether those are enforceable orders. What Morgan Stanley case are you referring to? It's cited in our briefs, Your Honor. It's Morris v. Morgan Stanley. I can get this cited for you. Okay. No, I know that case. I would call it Morris. That's why I didn't recognize it. Go ahead. Oh, sorry. Okay, yeah. 942 F. Second, 648. Again, so another order compelling them to arbitrate. No word from plaintiffs. No coming forward at this time and saying, we're not going to comply. And the other thing I would say — Right. So would your position be different? Let's suppose that when she issued the order, they had said — and they had filed a motion, a prompt motion to reconsider, and then when she didn't reconsider, they had said the next day, I — we are not going to arbitrate. Please enter an order of dismissal. Would your position be different? My position would not be different, but I think it would be a closer call for this Court. I think my position would not be different because if you're going to adopt this rule that Al-Turki doesn't really suggest — I mean, Al-Turki is a new trial, a retrial case, which I think presents different finality interests because there's already been a trial that the plaintiff won. But if you're going to look outside the circuit for other approaches, there are different ways, but what you consistently see the courts requiring are promptness, which wasn't here. We had 14 months of delay before he admitted he wouldn't come forward. You need to unequivocally go in, all in, right? I'm going to take the risk that I lose. Plaintiff did not do that here. He would like you to now construe the ambiguous statements in the Joint Status Report as a Rule 41a2. I may not have the subpart right, but basically a request for a voluntary dismissal. There's a procedure that occurs under that rule. You say — you come to the judge and you commit and say, I would like you to voluntarily dismiss my case, and I'm going to accept the consequences that flow with that. They never did that. And when the judge responded two days later, and this is the August 9, 2008, order, the judge said, all right, I see both sides talking about dismissal. Give me a letter with authorities spelling out what I should do. They retreated from the voluntary dismissal. And I think that closes that avenue off to this Court, because a district court can't dismiss voluntarily when the dismissal — voluntary dismissal request has been revoked. What the plaintiff came forward then and said, well, actually, here's two other ideas that we've thrown out there. Kagan. They didn't revoke it. They were basically — you may be right that not presenting an actual request for voluntary dismissal is a problem, but they — I don't read the letter as having revoked anything. It just said, well, here are some more ideas. Well, I think the district court was fair to consider that she would be at risk granting a voluntary dismissal at that point, given that they didn't follow any of the procedures for voluntary dismissal. It's not even clear. They didn't invoke any rule. It's not even clear what they meant. And a district court dismisses a case at its peril if it doesn't have clear authority and a clear, unambiguous request. Kagan. But your ultimate position is not that there isn't a way this could have been done, but it wasn't done properly, but it could have been done? I think the way this should have been done, there are three different things plaintiffs could have done but didn't do. And so this Catch-22 idea is wrong. This is a manufactured procedural problem. First of all, arbitrability is a provisional determination the first time the district court decides it. Well, they could have gone to arbitrate, but they said they weren't going to do that. So assuming that they had a principled position, that they weren't required to do it and they weren't going to do it, what could they have done about it? They could have moved from mandamus under this Court's order in Douglas, a decision they were aware of. They submitted it to the district court. I mean, how many safety valves does this Court have to create? What we're talking about here is the structure of the FAA, which where Congress specifically legislated that an order staying in compelling arbitration is not reviewable on appeal until after the arbitration. That's not an effort to make it never reviewable. It's an exhaustion requirement, which this Court upholds in all different kinds of contexts. And the reason it matters is sometimes there are overlapping issues where it's helpful to get a record where the arbitrator weighs in on contract intermediation or other issues, or here where a lot of the opposition to arbitration is based on speculative assertions about how much the arbitration is going to cost. The review after arbitration is de novo. Arbitrability. What is your understanding of the value of each of these claims? They are they have been the purchases each were $1,200 to $1,500. They are claims that carry attorney's fees and statutory damages. But I think there's two separate questions here that have to be teased apart. There's the Discover Bank question of whether the whole Can I go back? You were trying to tell me what the options were. I'd like to hear them. So what did I get? I get that they should have gone You said that he could arbitrate. You said that mandamus. What else? He could have timely requested a 1292B appealability certificate. Well, he did do that, no? He did not do it timely, Your Honor, and never actually moved for it. He mentioned it not even at the last day of the second court. But none of those would be an as-of-right appeal from the arbitration order on the ground that he was willing to take the consequences of the risk of losing, essentially. None of those options are that, but that's because that's the structure Congress legislated. Ginsburg. I mean, I'm looking at your brief, and you, in your statement of facts, go over the various suggestions that were made and alternatives that were considered, including a stay-pending resolution of Allstriker to try to settle whether this should have to go to arbitration or not. So I guess there's not — there doesn't seem to be much question to me here that the parties were — in the district court was uncertain as to the best way to proceed in order to finally resolve this issue. I think that the district court properly saw a litigant effectively thumbing its nose at the court. These are binding court orders to arbitrate, and they waited until the last day of compliance to first admit. But those are two different questions. Were they entitled to thumb their nose, and were they entitled to do it with the delay and indecision that there were? Two different issues. That's right. And right now, I'm sort of more interested in the first, although I understand the second may be a problem. But as to the first, if they had really thumbed their nose, if they had stood up and said, we are not going to do this, dismiss us, would that be okay? And then would they get us to review the arbitration order here? We submit not, because we think that that would basically be this Court creating So in that theory, the whole rest of it doesn't matter, because on your theory, the same exact thing would have happened. It does matter, Your Honor, because I sense a little resistance to my position. And if we're looking at intermediate positions, all of these other facts do matter. I mean, if you're going to allow a safety valve, and here, you know, it is a safety valve that contravenes the text of the statute. And I think that characterizing this as a failure to prosecute – I mean, for example, when you go through the failure to prosecute factors, they all look very silly as applied to this, because it oughtn't – if this is a failure to prosecute, then the delay doesn't make any difference. He wasn't screwing up the Court. The Court didn't want to do – the Court had said, I'm not going to do anything. So certainly, there wasn't an interference with the Court's calendar or anything like that. He was taking – so there's a mismatch. The pieces don't fit in the sense that the standards that govern a failure to prosecute, the problem that it's supposed to be solving is somebody who is refusing to go forward in court and interfering with the Court's processes. The Court is – but here, the Court's saying, I'm not going forward in court. So how is he failing to prosecute in court? He's – I think there is an interesting label problem. I think the factors actually do fit. And if you look at the Morris v. Morgan-Stanley, you'll see a court applying the five-factor – this Court. Kagan. The problem was there was a whole bunch of other things he didn't do, too, right? I mean, there was also – there were State actions, I'm going forward in court, and there was an arbitration. There were two different things going on, as I recollect. It is a much more complicated factual scenario. I think the basic fact, though, is the same. I think the distillation of Morris is you – it was – this Court said it was proper to dismiss because plaintiffs refused to go forward with arbitration in good faith. That may be – and Morris may be on point in that. And it – I still think that when you look at – when you look at the briefs on the question of the failure to prosecute, the arguments look silly because they're not really about the problem here, i.e. Well, okay. I'm going beyond this. Could you address the choice of law? Your Honor, I would actually submit that issue on the briefs. I think that those issues are briefed and – and, you know, Oestreicher, obviously, is a decision that we didn't love the first half of. I would point out the second half of it suggests that all of this may be a futile exercise because, you know, Oestreicher holds that the exact kind of claims that the plaintiff brought here don't actually stay claims. Oh, I'm sorry. The exact kind of claims that plaintiff brought here actually aren't supported under California law. And, you know, Judge – Judge Hamilton had that in front of her when she made this dismissal decision, too, and that may have influenced appropriately her evaluation of the merits. Well, she didn't have our decision in front of her. She did not have your decision in front of her. But I see the Court struggling with the idea of why can't a plaintiff just all in, right, just come right out and say, I want to dismiss this.  I mean, Huey says let's not hand the keys of finality to plaintiffs, even if it means it will sometimes kill their claims. Obviously, in Huey, and this is my reaction to Huey, that that plaintiff was really screwing up the Court. She had a hearing, a trial set for the next day, and he doesn't show up. He's not there. The parties are there. Everybody's there. He just doesn't show. The Court didn't focus on the failure to show factors. What they say is the failure to show reinforces the stipulation that they would not go forward. I mean, how many all-ins does a plaintiff get in a case? In this case, you're going to have at least two, because, remember, the stipulation isn't we won't stipulate, we won't arbitrate at the NEF. It's we will not individually arbitrate anywhere or litigate anywhere. So if this ---- I have one other question about this whole thing. It's such a procedural mess, but Green Tea says that if the ---- it seems to suggest that the district court could have dismissed with prejudice rather than staying. And if it did, that would have been appealable. Now, why isn't that an appropriate response to this kind of situation? All right, you're not going to arbitrate at all. You're going to take the risk that if you lose on appeal, there's no case. And why isn't it an abuse of discretion not to simply dismiss it? Because I think the district court properly concluded that we were entitled to an arbitration record. This is not ---- this is a basically going to small claims court. This is a short step to go through. It would have allowed us to flesh out the record on what the fees were going to be, what kind of proof the arbitrator required. They would be ---- they would have been back in front of Judge Hamilton probably by the end of summer in 2007, and then they would have been able to make all of their arguments about whether or not the arbitrability decision was right. Well, you're making one assumption, which is that they were going to lose. What if they won? If they won, I think it's just like if Dell sends them a settlement check tomorrow. Their position is that that arbitrator had no jurisdiction and no authority over them because they are right that this claim is not arbitrable. And so ---- And you're saying even if they won, they could have gone up? Absolutely. That has to be the way the structure works, because otherwise ---- In fact, that was the position you took when they suggested that they might take an interlocutory appeal. That's right. Let's wait and let's get our record. Okay. Thank you, Your Honor. Thank you. Your Honors, I recognize I used up all my time. I just have four very brief points. The first one is, and this is really important, we didn't thumb our nose at the district court. We take very seriously our obligations to litigate our cases. We were struggling mightily with what to do in front of that court. Well, you may have been struggling internally, but you certainly didn't struggle very publicly in the sense of the case. Well, we did, Your Honor, at every stage of the game, we told the court, if you send us to arbitration, we're not going to do it because it's prohibitively expensive. You can't enforce this, and that's what makes this impossible. You didn't make an actual motion to voluntarily dismiss. No, that's right, Your Honor. We didn't. And the reason is the court was engaged in this and asking us for options, and we were, frankly, trying to explain to the court with proper respect what we thought the options were. And, again, if you look at our ---- But you never said an option is a Rule 41a dismissal. We did say in our status conference statement that the court could enter a dismissal. I don't believe we cited the particular provision. I think that's right, Your Honor. But if you take a look at our letter, we very carefully said the dismissal is one option. Here are two additional options. We really did try to provide the court with options. The Morris case, as Your Honor pointed out, the facts are so different in the Morris case. This is nothing like the Morris case, if you just walk through the facts of that case. And I did just want to make one point about this other part of the Alienware decision. That's no final decision on this case, obviously. There's an appeal on a similar case that's going to be heard in this Court next month in the Hoey v. Sony case on these issues. I don't think the fact that there's a second half of Alienware that throws out the underlying claims under California law ---- Is this underlying claim really similar to Alienware? The underlying claim is similar to Alienware. It's not identical. It's probably more similar, I would say, to the claim in the Hoey v. Sony case, which is going to be argued next month. I forget the actual date. And there have been developments in California law on some of the claims that I won't bore the Court with, implied warranties, and things that make the ---- we think make it a live case if we get to finally litigate it in a fair forum. And I would just, final point, point the Court to Judge Nelson's decision again in the Doe v. AOL case, where she says that any forum that doesn't allow for class actions is per se violates California fundamental policy. And we would just point that to Your Honors. Thank you very much. Thank you. The Court appreciates the arguments presented on both sides of this matter. The case is submitted for decision.
judges: Strom, Schroeder, Berzon